Filed 10/19/21  P. v. Therman CA3

# NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C091147 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE024651) |
| v. | |
| SHYLOW MENYON THERMAN, | |
| Defendant and Appellant. | |

A jury found defendant Shylow Menyon Therman guilty of first degree murder and found true allegations of robbery-murder special circumstances and firearm use.  The jury also found that defendant had a prior serious felony conviction.  The trial court sentenced defendant to life without the possibility of parole for special circumstance murder, plus 25 years to life for the firearm enhancement.

Defendant appeals, arguing the trial court prejudicially erred by (1) admitting law enforcement testimony identifying him in surveillance videos, (2) admitting expert testimony regarding firearms toolmark comparison, and (3) instructing the jury on

1

alternative theories of murder pursuant to CALCRIM No. 548.  We reject these contentions and affirm.

## I.  BACKGROUND

*A.     The Shooting*

Joe and Doretha, husband and wife, drove to a small Sacramento shopping center on December 22, 2018, around 5:00 p.m.  They parked their minivan and went into a Money Mart check cashing store.

Doretha cashed a check at the Money Mart.  The couple then went to a liquor store next door, where they bought lottery tickets and beer.

Joe and Doretha returned to their minivan.  Doretha sat in the passenger seat, counting her money.  The passenger window was partly rolled down.  A man wearing a light blue sweatshirt appeared at the passenger window and demanded the money.  The man was holding a gun.  The man and Doretha wrestled over her wallet.

A Money Mart employee heard yelling and looked outside.  She saw a man wearing a blue hoodie standing by the passenger side of the minivan and "kind of wrestling" with Doretha.  She did not see the man's face.

Joe ran into the Money Mart to ask for help.  As he was opening the door, he heard a gunshot.  He ran back to the car, where he found Doretha, "laid out."  She was not breathing.  Joe saw a man walking away into the darkness.

Joe ran back inside the Money Mart and asked the employees to call 911.  Joe then remembered that he had a cell phone in his pocket.  He called 911 within minutes of the shooting.  He told the 911 operator that the shooter was an African American man wearing a "blue hoodie and black jeans."

Sheriff's deputies arrived and found Doretha slumped over in the minivan, with blood flowing from her mouth and nose.  An autopsy would later reveal that Doretha died of a gunshot wound to the head.

*B.* *The Investigation and Arrest*

Crime scene investigators processed the minivan and surrounding area. A .40 caliber Smith and Wesson cartridge casing was recovered from the ground near the passenger side of the vehicle.[1] Video surveillance footage was collected from the liquor store and Money Mart.

Sheriff's detectives interviewed Joe around 9:30 p.m. on the night of the shooting. Joe described the shooter as an African American man in his 30s, with a slender face, pointy chin, and scruffy goatee. He estimated the shooter weighed between 180 and 200 pounds and stood between 5 feet 8 inches and 6 feet 2 inches tall. He recalled that the shooter was wearing a blue hoodie and black pants.

During the interview, Joe was shown video footage from a surveillance camera inside the liquor store. Joe recognized only himself and Doretha in the video. But he noted that another man in the video was wearing the same color blue as the shooter.

Defendant was arrested on December 26, 2018, four days after the shooting. A search incident to arrest uncovered a Glock semi-automatic .40 caliber handgun in defendant's waistband. The handgun was partially loaded and had a live round in the chamber. A search of a car registered to defendant's wife and parked outside defendant's home uncovered a dark-colored beanie similar to one worn by the suspect in the surveillance video.

Joe was asked to view a live lineup in May 2019, some five months after the shooting. The lineup included defendant, but Joe picked someone else.

---

[1] Latent fingerprints and a DNA sample were also recovered from the minivan; however, this evidence would prove to have limited utility, as the fingerprints were not identifiable as defendant's and DNA analysis was inconclusive.

3

*C. The Charges and Jury Trial*

Defendant was charged by first amended information with first degree murder (Pen. Code, § 187, subd. (a))[2] with a special circumstance, namely, that the murder occurred during the commission or attempted commission of a robbery (§ 190, subd. (a)(17)). The information further alleged that defendant personally used a firearm during the commission of the crime (§ 12022.53, subds. (b) - (d)), and that he had been convicted of a serious felony within the meaning of the Three Strikes law (§§ 667, subds. (b) - (i) and 1192.7). Defendant pled not guilty and denied the allegations.

Defendant was tried before a jury in November 2019. The prosecution's witnesses testified substantially as described *ante*. The jury also heard the evidence described *post,* which was admitted over defense objection.

Catherine Currier, a criminalist with the Sacramento County District Attorney's Office, Laboratory of Forensic Services, testified as an expert on firearms toolmark identification. Currier examined the gun found on defendant and determined that it was a Smith and Wesson Glock model 23, with a polygonally rifled barrel. Currier explained that a polygonally rifled barrel differs from a conventionally rifled barrel in the direction of twist and number of lands (raised areas) and grooves (depressed areas). Currier preliminarily examined the class characteristics of the cartridge casing recovered from the scene and determined that they were consistent with the gun.

Currier explained that the tools used to manufacture firearms, and ordinary use or damage post-manufacture, leave unique—or individual—marks on firearm components, such as the breech face and firing pin. These marks, Currier continued, can be transferred onto the surface of a cartridge casing in the process of firearm discharge. As a firearms examiner, Currier elaborated, she uses a comparison microscope to compare the marks on

---

[2] Undesignated statutory references are to the Penal Code.

4

one or more cartridge casings fired from a gun of known origin, to one fired from a gun of unknown origin.[3] If the marks are sufficiently similar, Currier said, she can conclude that the cartridge casings were fired from the same gun. According to Currier, this approach to firearms identification is generally accepted in the scientific community.

Currier test-fired defendant's gun, using unspent cartridges from its magazine. She then compared the test-fired cartridge casings with the recovered cartridge casing, making a photographic record of her observations through the comparison microscope. Referring to the photographs, Currier explained that three dimensional striations (or striae) could be seen on the breech face mark, firing pin impression, and firing pin aperture sheer of the test-fired cartridge casings, which corresponded to similar striae on the recovered cartridge casing. Based on her examination, Currier concluded that the test-fired cartridge casings and recovered cartridge casing were fired from the same gun. Currier noted that an independent firearms examiner had reviewed her work and agreed with her conclusion. Defense counsel declined to cross-examine Currier.

Sacramento County Sheriff's Detective Marcos Camacho was one of the several detectives assigned to investigate the shooting. Camacho testified that he became aware of a traffic stop photograph of defendant in the course of his investigation. Camacho went on to say that he spent approximately one hour with defendant following his arrest on December 26, 2019. During this time, Camacho said, he observed defendant's physical bearing and movements, and studied the contours of his face. Camacho also received and reviewed booking photographs of defendant and attended the preliminary hearing and live lineup, where he again observed defendant from various angles.

Camacho testified that he carefully reviewed the surveillance video from the liquor store, focusing on footage in which an individual can be seen moving towards the

---

[3] A comparison microscope consists of two microscopes connected by an optical bridge, which allows for simultaneous, side-by-side comparisons.

camera for five to 10 seconds. Camacho explained that he analyzed the video from the liquor store on a frame-by-frame basis, and examined still photographs from the video, which were shown to the jury. Camacho also observed that the beanie found in the car parked outside defendant's house was similar to one worn by the suspect in the surveillance video. Based on the foregoing, Camacho opined that the suspect in the surveillance videos was defendant. Camacho explained: "The height, the weight, the overall body structure, primarily the bone structure of his chin. He has a pointed chin. It's very unique. That's evident in the video and also evident when you are in person with the defendant."

Camacho also testified that he had reviewed surveillance video showing the outside of the Money Mart. Camacho opined that an individual shown standing near Joe and Doretha's minivan, and wearing a blue hoodie, was the same as the suspect from the liquor store video.

D.     *Closing Arguments and Jury Instructions*

The parties' closing arguments focused on the identity of the shooter. The prosecutor argued that defendant saw Joe and Doretha in the liquor store and noticed that they were flush with cash from their trip to the Money Mart. It was then, the prosecutor argued, that defendant formulated a plan to rob them. When the robbery failed, the prosecutor continued, defendant decided to kill Doretha.

The prosecutor acknowledged that Joe had not been able to identify defendant in the live lineup. The prosecutor also acknowledged that one of the surveillance videos appears to have shown defendant leaving the liquor store and turning right, while Joe and Doretha turned left. Nevertheless, the prosecutor reminded jurors that Detective Camacho had studied defendant and identified him as the person in the liquor store video. The prosecutor emphasized that Joe, though unable to identify defendant as the shooter, had nevertheless provided a description that matched both defendant and the person in the surveillance videos. The prosecutor reminded jurors that defendant had been found

6

with the gun and black beanie four days after the shooting and urged them to find him guilty of first degree murder under either felony murder or premeditation and deliberation theories.

During the defense closing argument, trial counsel acknowledged that defendant was the person in the liquor store video, but maintained he was not the shooter. Defense counsel played the video for the jury, noting that defendant appeared to pay no particular attention to Joe and Doretha, left the liquor store before them, and walked in the opposite direction from their minivan. Defense counsel observed that the Money Mart's security camera was triggered by motion and argued that the shooter appeared in the parking lot and triggered the camera after defendant left. Defense counsel emphasized that there was no DNA evidence tying defendant to the crime, and Joe had repeatedly failed to identify him as the shooter.

Following closing arguments, the trial court properly instructed the jury on first degree murder under the theories of premeditation and felony murder. (CALCRIM Nos. 520, 521, and 540A.) As relevant here, the trial court also instructed the jury with CALCRIM No. 548, which provided, in pertinent part: "You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories. You do not all need to agree on the same theory, but you must unanimously agree whether the murder is in the first or second degree." [4]

E.    *Verdict and Sentence*

---

[4] The trial court's instructions conformed to a previous version of CALCRIM No. 548. (CALCRIM No. 548 (Sept. 2019 rev.).) Further references to CALCRIM No. 548 are to this version.

The jury found defendant guilty of first degree murder after several hours of deliberation. (§ 187, subd. (a).) The jury found true the special circumstance allegation that the murder was committed during the commission of an attempted robbery. (§ 190.2, subd. (a)(17).) The jury also found true allegations that defendant used a firearm (§ 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally discharged a firearm causing death (§ 12022.53, subd. (d)). In a bifurcated proceeding, the jury also found true an allegation that defendant had a prior conviction for armed bank robbery.

Defendant appeared for sentencing on December 20, 2019. The trial court sentenced defendant to life without the possibility of parole for the special circumstance murder, plus 25 years to life for the firearm enhancement. This appeal timely followed.

## II. DISCUSSION

### A. *Lay Opinion Identification Testimony*

Prior to trial, the prosecution brought a motion in limine seeking to admit Detective Camacho's testimony that defendant was the person shown in the surveillance videos from the liquor store and Money Mart.[5] The trial court granted the motion over defense objection. Defendant argues Camacho's lay opinion testimony was erroneously admitted and violated his rights to due process and a fair trial. We are not persuaded.

Lay opinion testimony is admissible if it is both rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony. (Evid. Code, § 800.) As relevant here, a person who did not witness a crime may identify a defendant from photographs or surveillance video if the person has personal knowledge of the defendant's appearance and the testimony will assist the trier of fact in resolving

---

[5] The prosecution also sought to admit lay opinion identification testimony from another detective, who was involved in the investigation, but was also familiar with defendant from an unrelated case. The trial court denied the motion as to the other detective.

8

the identity issue. (*People v. Leon* (2015) 61 Cal.4th 569, 600-601 (*Leon*); *People v. Mixon* (1982) 129 Cal.App.3d 118, 128 (*Mixon*); *People v. Perry* (1976) 60 Cal.App.3d 608, 614-615 (*Perry*).) We review a trial court's admission of lay opinion testimony for abuse of discretion. (*People v. Thompson* (2010) 49 Cal.4th 79, 128-130.)

"Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*Leon, supra,* 61 Cal.4th at p. 601.) In *Perry*, *supra,* another panel of this court held that a police officer's identification of the defendant as one of two robbers seen on a surveillance film of the crime was admissible as lay opinion testimony because the officer was familiar with the defendant from numerous contacts over the previous five years. (*Perry, supra,* 60 Cal.App.3d at p. 610.) In *Mixon*, the court held that an officer's identification of the defendant as the person seen in surveillance photographs taken during the commission of the robbery was an admissible lay opinion because the officer had "previously acquired familiarity with [the defendant's] features." (*Mixon, supra,* 129 Cal.App.3d at p. 132.) In both cases, the officers' identifications were based on their personal knowledge of the defendants from contacts before the robbery; this helped the juries because each defendant had altered his appearance before trial. (*Mixon, supra,* at p. 130; *Perry, supra,* at p. 613.)

Our Supreme Court extended the reasoning of *Perry* and *Mixon* in *Leon*. (*Leon, supra,* 61 Cal.4th at p. 601.) There, the trial court admitted a detective's testimony identifying the defendant as the person shown on surveillance videos of two robberies. (*Id.* at pp. 600-601.) The detective testified that he became familiar with the defendant's appearance through his participation in the defendant's arrest a day after one of the robberies, and from later seeing him "nearly 10 times." (*Id.* at p. 600.) The detective also observed that the jacket the defendant wore during the arrest was similar to one worn by one of the robbery suspects in the video. (*Ibid.*)

The defendant challenged the admission of the detective's testimony on appeal, arguing that *Perry* and *Mixon* were distinguishable because the officers in those cases had

contacts with the defendants before the crimes. (*Leon, supra,* 61 Cal.4th at p. 601.) The high court rejected the defendant's argument, stating: "This is a distinction without a difference. It is undisputed [the detective] was familiar with defendant's appearance around the time of the crimes. Their contact began when defendant was arrested, one day after the [robbery captured in the video]. Questions about the extent of [the detective's] familiarity with defendant's appearance went to the weight, not the admissibility, of his testimony." (*Ibid.*) Moreover, the court continued, jurors had been shown the video, and "could make up their own minds about whether the person shown was defendant." (*Ibid.*)

*Leon* is fatal to defendant's claim of error. Like the detective in *Leon,* Detective Camacho became familiar with defendant's appearance through his participation in events surrounding defendant's arrest. (*Leon, supra,* 61 Cal.4th at p. 600.) As previously discussed, Camacho spent approximately one hour with defendant following his arrest on December 26, 2019, four days after the shooting. Camacho was thus familiar with defendant's appearance "around the time of the crimes." (*Id.* at p. 601.) Here, as in *Leon,* any question regarding Camacho's familiarity with defendant's appearance "went to the weight, not the admissibility, of his testimony." (*Ibid.*) That Camacho may have had no prior familiarity with defendant is not determinative. (*Id.* at p. 600.)

Defendant argues that Detective Camacho's testimony was not helpful to the jury, as jurors were equally capable of watching the videos and determining whether they depicted him or someone else. But Camacho testified that he had observed defendant on several occasions and studied defendant's physical bearing and the contours of his face from various angles. Camacho also testified he had reviewed booking photos of defendant and examined the surveillance videos on a frame-by-frame basis. From these close observations, Camacho determined that defendant has an unusually pointy chin, a feature that can also be seen on the video from the liquor store. Although jurors were able to observe defendant in the courtroom, they might not have been able to study his movements or the contours of his face. Certainly, they would not have had the

10

opportunity to study him closely. The trial court could reasonably conclude that Camacho's "testimony was based on his relevant personal knowledge and aided the jury." (*Leon, supra,* 61 Cal.4th at p. 601.) Defendant fails to establish any abuse of discretion in the admission of Camacho's lay opinion identification testimony.

Defendant argues the admission of Detective Camacho's testimony violated his constitutional rights. We disagree. "Application of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035.) Defendant fails to show that this case warrants any departure from the general rule. (*Id.* at p. 1036.) As explained, the trial court properly admitted Camacho's testimony. "Because the trial court's ruling was not an abuse of discretion . . . defendant's constitutional claim also fails." (*People v. Miranda* (2011) 199 Cal.App.4th 1403, 1426.)

B.      *Firearms Comparison Testimony*

Defendant next argues the trial court erred in admitting Currier's expert opinion testimony that the cartridge casing recovered from the scene was fired from the gun found in his waistband. He argues the trial court should have excluded Currier's testimony or conducted a *Kelly* hearing on firearms comparison evidence.[6] He also argues the trial court abused its discretion by failing to act as a "gatekeeper" as required by *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*). We reject these contentions.

1.      *Additional Background*

Before trial, defendant moved in limine to exclude firearm comparison evidence, or alternatively, to require a *Kelly* hearing to determine the admissibility of such evidence. The motion relied on an excerpt from a report compiled by the President's

---

[6] *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*).

11

Council of Advisors on Science and Technology. (President's Council of Advisors on Science and Technology, Report to the President, Forensic Science in Criminal Courts: Ensuring Validity of Feature-Comparison Methods (Sept. 2016) (PCAST report).) The PCAST report raises concerns about the foundational validity of firearm and toolmark comparison analysis. It criticizes firearm comparison methods as "subjective," and characterizes the criteria for making an identification as "circular." (*Id.* at p. 104.) The PCAST report calls for "multiple independent black box studies" to provide estimates of reliability and notes that only one such study had been conducted at the time of publication. (*Id.* at pp. 106, 111.) The PCAST report makes no recommendation as to the admissibility of firearms comparison evidence in criminal proceedings but leaves that decision to trial courts. (*Id.* at p. 112 ["Whether firearms analysis should be deemed admissible based on current evidence is a decision that belongs to the courts"].)

Defendant's motion acknowledged that firearms comparison evidence has traditionally been deemed admissible (see, e.g., *People v. Cowan* (2010) 50 Cal.4th 401, 470 (*Cowan*)), but argued "the relevant scientific community no longer accepts the scientific validity of firearm identifications which purport to demonstrate a match of an unknown casing or bullet to a specific firearm to the exclusion of all others." The motion also argued the firearms comparison testimony was inadmissible under *Sargon* because there was "too great an analytical gap" between Currier's data and proffered opinion. The motion sought to exclude Currier's testimony entirely or, in the alternative, preclude her from presenting her opinions in terms suggesting absolute certainty.

The prosecution opposed the motion. The prosecution argued that concerns about the reliability of firearms comparison evidence should be addressed through cross-examination, rather than exclusion. The prosecution additionally argued that *Kelly* does not apply to firearms comparison evidence, which jurors can easily evaluate for themselves.

12

The trial court heard argument and denied the motion. The trial court observed that "fair and impartial analysis and comparison evidence has been regularly admitted in criminal trials through expert testimony, and toolmark identification evidence has been admitted in California for over 60 years." (See *People v. Godlewski* (1943) 22 Cal.2d 677, 684-685.) The trial court concluded that firearms comparisons are not subject to *Kelly*, as the technique is not new, and jurors can see and evaluate the comparisons for themselves.

The trial court then turned to the PCAST report. The trial court indicated that the court had both read the PCAST report and conducted its own research. The trial court observed that the PCAST report was "not the only opinion on the scientific validity of firearm identification analysis," adding that the report's conclusions had been "quickly and publicly rejected" by former U.S. Attorney General Loretta Lynch and the Federal Bureau of Investigations and refuted by the Association of Firearm and Toolmark Examiners. The trial court also observed that the PCAST report "was itself not a peer-reviewed work." Under the circumstances, the trial court concluded that the PCAST report could not be considered dispositive and should not foreclose expert opinion testimony on firearms comparisons.

The trial court then considered defendant's *Sargon* argument. The trial court rejected defendant's contention that the PCAST report constituted an independent basis for categorically excluding Currier's testimony. The trial court continued: "At this juncture, based on the pleadings I have before me, I have no basis to assess whether the anticipated forensic ballistic expert's opinions are founded on matter, procedures, materials or deductions that are so lacking in value as to render them excludable under *Sargon*." Defense counsel argued, based on evidence presented at the preliminary hearing, that Currier intended to testify that she had a "zero error rate" and had "never made a false positive." The prosecutor responded that Currier had previously testified only that she passed all of her proficiency tests. The prosecutor assured the trial court

13

that Currier did not intend to testify that she had a "zero error rate." The trial court denied defendant's motion, noting that any testimony that Currier or the crime lab had never made a mistake would be fodder for cross-examination.

### 2. Kelly *Hearing*

Defendant argues the trial court should have conducted a *Kelly* hearing before admitting the prosecution's firearms comparison evidence. He acknowledges that firearms comparison evidence "has long been admitted in California courts and courts throughout the country," but asserts the PCAST report raises so much doubt regarding the reliability of such evidence that it can no longer be said to be generally accepted within the relevant scientific community. We cannot agree.

The trial court has broad discretion in deciding whether to admit or exclude expert testimony. (*People v. Jones* (2013) 57 Cal.4th 899, 946.) " 'Under *Kelly*, the proponent of evidence derived from a new scientific technique must establish that (1) the reliability of the new technique has gained general acceptance in the relevant scientific community, (2) the expert testifying to that effect is qualified to give an opinion on the subject, and (3) the correct scientific procedures were used.' " (*Id.* at p. 936.) "The purpose of these threshold requirements—commonly referred to as the *Kelly* test—is to protect against the risk of credulous juries attributing to evidence cloaked in scientific terminology an aura of infallibility." (*People v. Peterson* (2020) 10 Cal.5th 409, 444.)

"Not every subject of expert testimony needs to satisfy the *Kelly* test. Courts determining whether *Kelly* applies must consider, first, whether the technique at issue is novel, because *Kelly* ' "only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is new to science and, even more so, the law." ' [Citation.] Second, courts should consider whether the technique is one whose reliability would be difficult for laypersons to evaluate. A '*Kelly* hearing may be warranted when "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only

14

accurately recognize and relay to the jury." ' [Citation.] Conversely, no *Kelly* hearing is needed when '[j]urors are capable of understanding and evaluating' the reliability of expert testimony based in whole or in part on the novel technique." (*People v. Peterson, supra,* 10 Cal.5th at p. 444.)

We are inclined to agree with the trial court that the firearm comparison techniques here are not subject to *Kelly*, as they are neither new to science or the law, nor so foreign to everyday experience that jurors would have unusual difficulty evaluating them. (*People v. Azcona* (2020) 58 Cal.App.5th 504, 511 (*Azcona*)[questioning whether firearm comparisons are subject to *Kelly*, and noting that "visual comparison of marks on physical objects is not so foreign to everyday experience that jurors would have unusual difficulty evaluating it"]; see also *Cowan, supra,* 50 Cal.4th at p. 470 [ballistics comparisons and toolmark identification through the use of molds were not new techniques, but rather, a combination of existing techniques, which were not beyond common understanding and not subject to *Kelly*]; see also *People v. Venegas* (1998) 18 Cal.4th 47, 81 [contrasting DNA evidence, which requires validation under *Kelly*, with other types of analysis based on observations that jurors essentially can see for themselves].) We need not decide this question, however, as we would conclude the expert testimony was admissible, even assuming *Kelly* applies.

As indicated ante, defendant acknowledges that firearms comparison techniques have previously been deemed admissible in California courts. (See *Cowan, supra,* 50 Cal.4th at p. 470.) Defendant does not dispute that firearms comparison techniques have been generally accepted as reliable in the past (though no published opinion so holds), but argues they are *no longer* so accepted. (*Azcona, supra,* 58 Cal.App.5th at p. 511, fn. 1.) We accept defendant's apparent concession and assume for purposes of analysis that firearms comparison evidence has traditionally been accepted as generally reliable. (*Ibid.*)

15

"When the continuing admissibility of scientific evidence is at issue, rather than it being the proponent's burden to show the technique is generally accepted by the scientific community, the burden shifts to the opposing party to produce new evidence showing it no longer is." (*Azcona, supra,* 58 Cal.App.5th at p. 511.) To carry this burden, the opposing party must show that "a clear majority of the relevant scientific community no longer accepts the method as reliable." (*Id.* at p. 512.) "Appellate review of a trial court's determination regarding a scientific technique's general acceptance is de novo." (*Id.* at p. 511.)

Applying these standards, and exercising our independent judgment, we conclude defendant has failed to carry his burden. Defendant offered compelling evidence that a credible body found cause for concern about firearms comparison testimony. The PCAST report casts doubt on the reliability of firearms comparison techniques and undermines confidence in Currier's conclusion that the cartridge casing recovered from the scene was fired from the gun found on defendant. But the PCAST report "falls short of establishing that a 'clear majority' of the relevant scientific community no longer accepts firearm toolmark comparison as reliable." (*Azcona, supra,* 58 Cal.App.5th at p. 512.) The PCAST report, though undeniably credible and concerning, does not, alone, define the relevant scientific community, much less demonstrate that a clear majority of that community now rejects firearms comparison evidence as unreliable.[7] (*Id.* at pp. 512-513 ["Criticism of the method from credible sources surely affects the persuasive value of the evidence, but it does not equate to what defendant needed to show to render the firearms expert's testimony *inadmissible:* that the method is no longer accepted by a clear

[7] We note here that the PCAST report was concerned with the absence of black-box studies demonstrating the error rate for firearms comparison techniques, but such studies appear to have been completed since the report's publication some five years ago. (See *United States v. Harris* (D.D.C. 2020) 502 F.Supp.3d 28, 39 [noting that recent black-box studies "have resolved some of the concerns raised by the PCAST report"].)

majority of the relevant scientific community"].)  On the record before us, we conclude that defendant has failed to show that firearms comparison testimony is categorically inadmissible under *Kelly*.

> *3.*     Sargon

Defendant next argues the trial court failed to perform its gatekeeping function under *Sargon, supra.*  He argues, again, that firearms comparison techniques are unreliable and suggests the trial court had an independent duty under *Sargon* to determine the reliability of such techniques using the criteria set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 (*Daubert*).  Again, we disagree.

"Trial judges have a critical gatekeeping function when it comes to expert testimony beyond merely determining whether the expert may testify at all." (*Azcona, supra,* 58 Cal.App.5th at p. 513.)  Expert evidence that does not require a *Kelly* analysis must still be admissible under Evidence Code sections 801, subdivision (b), and 802, which require that the trial court act as a gatekeeper to exclude expert opinion testimony "that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon, supra,* 55 Cal.4th at pp. 771-772.)

"The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness.  The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion.  Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies.  Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.'  [Citation.]  The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion.  [Citation.]  In short, the gatekeeper's role

17

'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " (*Sargon, supra,* 55 Cal.4th at p. 772.) We review the trial court's decision regarding the permissible scope of expert opinion testimony for abuse of discretion. (*Id.* at p. 771.)

Defendant argued in the trial court that Currier's expert opinion testimony should be excluded or limited because there was "too great an analytical gap" between the toolmark evidence and Currier's opinion that the cartridge casing recovered from the scene was fired from the gun found on defendant. (*Sargon, supra,* 55 Cal.4th at p. 771 [explaining that a trial court performing its gatekeeping function " 'may conclude that there is simply too great an analytical gap between the data and the opinion proffered' "].) This argument was based, it seems, on trial counsel's expectation that Currier would testify to an "infallible" conclusion that the cartridge casing was fired from defendant's gun, to the exclusion of any other gun. But Currier was not asked to characterize or quantify the degree of certainty with which she held her opinion at trial, and defendant does not renew his "analytical gap" argument on appeal. Instead, he argues the trial court abdicated a gatekeeping duty to determine the reliability of firearms comparison evidence using the criteria set forth in *Daubert*.[8] Defendant's argument assumes that *Sargon* requires that trial courts apply the federal *Daubert* standard in considering the admissibility of scientific evidence. That assumption is incorrect.

---

[8] In *Daubert*, the U.S. Supreme Court identified four factors that may assist a trial court in determining the admissibility of an expert's testimony: (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline. (*Daubert, supra,* 509 U.S. at pp. 593-594.) These factors are not definitive or exhaustive and may not apply in every case. (*Kumho Tire Co., Ltd. v. Carmichael* (1999) 526 U.S. 137, 151; *Kannankeril v. Terminix Intern., Inc.* (3rd Cir. 1997) 128 F.3d 802, 806-807.)

The admissibility standards for novel scientific evidence under *Kelly* and *Daubert* are different. "Under the *Kelly* test, the admissibility of evidence obtained by use of a scientific technique does not depend upon proof to the satisfaction of a court that the technique is scientifically reliable or valid. [Citation.] Because courts are ill-suited to make such determinations, admissibility depends upon whether the technique is generally accepted as reliable in the relevant scientific community." (*People v. Bolden* (2002) 29 Cal.4th 515, 546.) Under *Daubert*, by contrast, the federal courts "conduct a broader inquiry which allows the court to exercise its own judgment about whether the technique used is reliable." (*Azcona, supra,* 58 Cal.App.5th at pp. 510-511; see also *Daubert, supra,* 509 U.S. at p. 597 [explaining that Federal Rules of Evidence (28 U.S.C.), rule 702 imposes a gatekeeping duty on the trial judge to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand"].)

Defendant suggests that *Sargon*'s gatekeeping principles require the trial court to independently evaluate novel scientific evidence under the federal *Daubert* standard. Our Supreme Court has considered—and rejected—a similar argument in *People v. Lucas* (2014) 60 Cal.4th 153 (*Lucas*). There, the defendant challenged the admissibility of several types of blood evidence, arguing, inter alia, that GM and KM antibody genetic testing techniques are not generally accepted as reliable in the relevant scientific community. (*Id.* at p. 244.) Our Supreme Court rejected the defendant's first-prong *Kelly* challenge, noting that the United States Supreme Court and several courts of appeal had recently upheld the admissibility of evidence obtained by use of the same techniques. (*Ibid.*) In a footnote, the *Lucas* court observed: "Defendant also attacks the first prong of *Kelly* itself, claiming that this aspect of our analysis violates federal due process by undermining the trial court's gatekeeping function and barring relevant evidence at the pretrial stage Essentially, defendant argues that the first prong of *Kelly* improperly relies upon what the scientific community accepts as to the reliability of a technique, thereby supplanting the trial court's independent determination of reliability as required by

19

[*Daubert*].  But we have previously rejected such claims, and defendant offers no persuasive reason for reconsideration of our conclusion.  [Citation.]  In addition, our opinion in [*Sargon*], did not, by using the term 'gatekeeper,' indicate any move away from the *Kelly* test toward the federal *Daubert* standard." (*Lucas, supra,* 60 Cal.4th at p. 245, fn. 36.)

Likewise, in the present case, defendant's *Sargon* argument amounts to an invitation to abandon the *Kelly* test in favor of the federal *Daubert* standard.  This we cannot do.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  The trial court surveyed a wide range of scientific perspectives and reasonably found that firearms comparison evidence continues to be generally accepted in the relevant scientific community.[9]  The trial court had no obligation under *Sargon* to independently evaluate the reliability of firearms comparison evidence under the federal *Daubert* standard. (*Lucas, supra,* 60 Cal.4th at p. 245, fn. 36.)  We reject the claim of error.

C.      *CALCRIM No. 548*

As indicated above, the prosecution argued defendant was guilty of first degree murder on two alternative theories: murder by premeditation and deliberation and felony murder.  Defendant argues the trial court erroneously instructed the jury with CALCRIM No. 548, which told jurors they needed to unanimously agree on the crime, but not the theory of the crime.  (CALCRIM No. 548 (Sept. 2019 rev.) ["You may not find the defendant guilty of murder unless all of you agree that the People have proved that the defendant committed murder under at least one of these theories.  You do not all need to

_____

[9] The trial court also surveyed federal cases addressing firearms comparison evidence, and defendant refers us to several such cases in his opening brief.  As the trial court observed, however, these authorities are not binding on us.  They are also of limited utility given the differences in federal and state law described in the text.  (*Azcona, supra,* 58 Cal.App.5th at p. 511 ["As a result of the difference in state versus federal approaches, the federal authorities cited by defendant are of limited value here because they focus on directly examining the reliability of toolmark comparison methods"].)

agree on the same theory, but you must unanimously agree whether the murder is in the first or second degree"].)  Relying on the U.S. Supreme Court's recent opinion in *Ramos v. Louisiana* (2020) __ U.S. __, [140 S.Ct. 1390] (*Ramos*), defendant argues CALCRIM No. 548, though previously viewed as a correct statement of law, must now be seen as having violated his constitutional right to a unanimous verdict.  We disagree.

California has long recognized that a criminal defendant has a constitutional right to a unanimous verdict that he or she is guilty of a specific crime.  (*People v. Russo* (2001) 25 Cal.4th 1124, 1131.)  "But the jury need not unanimously agree on subsidiary factual issues, such as specific details of the act."  (*People v. McDaniel* (2021) 12 Cal.5th 97, 145.)  "[W]here the evidence shows only a single discrete crime but leaves room for disagreement as to how exactly that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or . . . the 'theory' whereby the defendant is guilty."  (*People v. Russo, supra,* at p. 1132.)  CALCRIM No. 548 accurately states the law on these points.

Defendant argues CALCRIM No. 548 can no longer be considered a correct statement of the law after *Ramos*.  *Ramos* held that the federal Constitution mandates that jury verdicts in criminal cases be unanimous, but California has long required that.  (*Ramos, supra,* 140 S.Ct. at p. 1397; *People v. Russo, supra,* 25 Cal.4th at p. 1132 ["In a criminal case, a jury verdict must be unanimous"].)  "Given California's existing requirement of a unanimous verdict, the Supreme Court's decision [in *Ramos*] has no direct effect on California."  (*People v. Wilson* (2020) 56 Cal.App.5th 128, 161, fn. 17.)  Nothing in *Ramos* supports defendant's argument—which our own Supreme Court has "repeatedly rejected"—that the jury must unanimously agree on a theory of first-degree murder before returning a guilty verdict for that crime.  (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 496.)  We therefore reject the claim of instructional error.

But even assuming *arguendo* that *Ramos* upended California law, such that CALCRIM No. 548 can no longer be considered valid, we would still conclude that

21

reversal is not warranted.  As noted, the jury found defendant guilty of first degree murder.  The jury also found true the special circumstance that he murdered Doretha during the commission of an attempted robbery, and personally and intentionally discharged a firearm causing great bodily injury or death to Doretha.  (§ 12022.53, subd. (d).)  The jury's true findings establish that jurors unanimously agreed that defendant was the shooter and was guilty of first degree murder on a felony murder theory.  We therefore conclude that any error in the trial court's instruction with CALCRIM No. 548 was harmless beyond a reasonable doubt.  (*People v. Moore* (2011) 51 Cal.4th 386, 412 [instructional error as to unanimity on degree of murder held harmless in light of true special circumstance findings:  "The lesser offenses of second degree murder and manslaughter were not legally available verdicts if defendant killed [the victim] in the commission of burglary and robbery, as the jury unanimously determined he had"].)

## III.  DISPOSITION

The judgment is affirmed.


/S/

_____

RENNER, J.



We concur:


/S/

_____

BLEASE, Acting P. J.


/S/

_____

ROBIE, J.